Moving on to case two, Bedford v. Dewitt et al. Good morning, your honors, and may it please the court. Jeff Nestlin for the Plaintiff Appellate. This appeal presents a number of evidentiary rulings which prevented Miss Bedford from getting a fair trial. There was improper expert testimony about malingering, complete with illustrative examples of secondary gain. There was improper inflammatory testimony days after the use-of-force incident by a nurse at a hospital that was only used to portray Miss Bedford as some kind of violent racist. And there was extensive use of the City of Chicago's own use-of-force model, which the defense used so the officer could become his own use-of-force expert and confuse the jury about the legal standard that compliance with his model, with his department model, meant that his actions were constitutional. I'd like to start with the 702 violation. In this case, the defense retained expert, a neurologist, Dr. Shepard, was permitted to testify about malingering. He gave the jury a lecture about the definition of malingering. He told the jury about examples of secondary gain, even though that specifically had been barred by the trial court. And when we objected to that, the defense just pivoted to specific examples of secondary gain. Slip and falls in front of a target, workers' compensation cases. And what was truly amazing is that their expert agreed with the treating psychiatrist that Miss Bedford suffered from psychogenic, non-epileptic seizures. That's a mouthful, but that is a mental health disorder. Her seizures were caused by stress, anxiety, panic attacks, and certainly being thrown to the ground by a policeman. Their expert agreed with the treating psychiatrist that that was 100% her diagnosis, psychogenic, epileptic, non-epileptic seizures. Yet he was able to talk about malingering and give examples. And so it transformed what was an agreement between experts on a mental health diagnosis. It transformed Miss Bedford into some kind of slip and fall scam artist that she was just in front of this jury for money. Now this court and courts around the country have consistently held that experts cannot comment on the credibility of witnesses. Malingering is out of bounds, and there's a good reason for that, because weighing the testimony of witnesses, weighing the evidence, is in the exclusive provision of the jury. An expert's not supposed to cross that line and tell you who's telling the truth and who's lying. So because there was that express prohibition, what the defense did is allowed to put their expert up there just to talk about malingering in general, just to throw mud on it. Counsel, I looked at the expert report. There is no diagnosis of malingering, right? So you say malingering is out of bounds. Is it that it's always out of bounds, or is the problem with the, this is an unsupported opinion, unsupported by an evaluation or a diagnosis of malingering? Exactly. If you look at the 702 requirements, there was no detailed methodology, no opinion, no conclusion that she was malingering. Correct. And do you feel that below, I read the transcript, which is not very long, on this issue, there was reference to this Daubert motion coming late. Can you just fill me in a little bit about when this motion came in? Because I'm concerned that the issues were not fully fleshed out for the judge below. Right. Because she seemed to think that there was a malingering diagnosis, at least. That's a good point, Judge, because if you just look at the report, Dr. Shepard's report says she either suffers from a functional neurological disorder, which includes these psychogenetic non-epileptic seizures, or she's malingering for secondary gain. That was what was in the report. So we brought a motion in limine saying there is no conclusion, he hasn't reached any opinions, and the secondary gain and malingering should be out of bounds. And the lower court said, well, he is reaching an opinion, he's saying it's either this or that. So I'll keep out secondary gain, but he can still say that there's a conclusion that she's malingering. And I objected and said there is no conclusion. He's saying it's either this or that, and you really can't get into malingering either way. At trial, the defense pivoted. There was no either-or conclusion. He agreed 100% with the psychogenic non-epileptic seizure diagnosis. He agreed with that, but then went on to say, well, let me tell you also about malingering, without any connection or nexus to the plaintiff. And that's what was improper, because he was able to do a indirect character assassination through medical testimony. And that's what denied Ms. Bedford a new trial. They were able to say malingering and just kind of throw it up there and see what would stick. Without any kind of methodology or opinion or conclusion at all, that any one piece of evidence was, oh, this is evidence of malingering. There was none of that. So by introducing malingering, it just poisoned this whole case. What would you say, there was no malingering diagnosis, correct? Right. But there was evidence in the record that was suggestive that she was exaggerating, apart from Dr. Shepard, right? There was some testimony to that effect. Absolutely. Right. So would this be harmless error to have an expert come in and add to that evidence for the defense? Respectfully, it's not harmless error because it comes in through an expert. And I think that that changes the analysis. Because experts, again, repeatedly have not been able to comment on witnesses because it infringes on the jury's role. So whether or not there was evidence of an exaggeration, Dr. Shepard never said there was. He never looked at a piece of evidence and said, this is malingering. So respectfully, it's not harmless error because, again, it comes in through an expert. And there's absolutely no legal authority for this. The cases cited by the defense are administrative law cases where someone's trying to get disability or criminal cases where the court has ordered a competency evaluation for an insanity defense. There is not one case, and I challenge the other side to come up with one case where malingering comes into a civil case and it's okay and it's not error. If I could move on, the next improper character attack came from the testimony of a nurse days after the use of force incident when Ms. Bedford was getting ready to be discharged from the hospital. She had an incident with a nurse. And the court allowed this to come in because it had to do with damages. That was the rationale the court set. This alleged incident with the nurse had absolutely nothing to do with... Correct? Wasn't that also a basis for the district judge's rationale to let the nurse's testimony in? But that was incorrect because Dr. Dupont had already seen Ms. Bedford, already diagnosed her with this mental health condition. And she'd been cleared for discharge by the treating neurologist, Dr. Nowak, before she even encountered the nurse. So she was basically on her way out before she encountered the nurse. But she gets into it with the nurse, and now we had the classic, this is going to be a trial within a trial. Because Ms. Bedford, of course, disagreed with the way she was portrayed by the nurse. Who said what? Was it about her family being there? Did it have more to do with her boyfriend? Why was she upset? And the reason the defense wanted to get it in, they said, was well, it goes to damages. They could easily have done that without the prejudicial inflammatory comments. And did you ask for a limiting instruction, telling the jury that this only went to damages? Judge, I don't believe, I don't believe there was a limiting instruction. No. Did you ask for one? I don't believe so. I don't believe so. But we had a motion in limine to try to keep all this out. We renewed our motion in limine, trying to give the judge a more detailed timeline that it didn't really go to damages. And then as the nurse was testifying, we asked for a sidebar. And again, renewed my objection. And the point was this, if you wanted to get in about damages, that she was leaving the hospital early against medical advice, you could do that. You didn't need to drag out of the nurse, who clearly did not want to testify to this. She repeatedly had to be pointed to her deposition about, I want to get the F out of here, F this place. Why was that necessary? What did that have to do with damages? You could get out the point she wanted to leave the hospital against medical advice without the inflammatory prejudicial comments. And specifically, when she was arguing with the nurse, the nurse already said she was uncooperative. She was angry. She was very emotional. But again, that wasn't good enough for the defense. They wanted the inflammatory language. And again, had to pull it out of the nurse, the exact quote, I'm going to kill that Asian bee. This threat of violence against a nurse at a hospital. There is really no coming back from that, if you're the plaintiff, that your client threatened to kill a nurse at a hospital. It was highly inflammatory. It was severely prejudicial. And again, had nothing to do with damages. The testimony was already in that she wasn't cooperative and wanted to leave early. So let's say I buy that, that it was prejudicial, that Asian bee comment. You have all this other evidence of Bedford's uncooperative and hostile behavior, right? I mean, how do we remand on that, on that issue? I mean, how are you so sure that that would have affected the outcome of the trial? Because it wasn't, it was a threat. It wasn't necessarily a racial slur. It was violent. What's your best argument for that? It was not harmless because those comments were allowed to portray Ms. Bedford as some kind of violent racist. There were no threats of violence other than that comment. She might have been uncooperative. She didn't want to be at the hospital. And this is two days after being treated at the hospital for what we now know is not a medical injury, but this mental health injury. So I submit that this was not harmless because this injected the argument now that she is some kind of violent person, unworthy of recovery. I'd like to save my next few minutes for rebuttal. I want to just comment quickly though on the use of force model because I think this is important. This comes up an awful lot in the lower courts in excessive force cases. Police are allowed to talk about training, yes. But what they cannot, should not do, and what this court explicitly prohibited them doing in US v. Brown was using this model, this color-coded model, this escalation in different categories. If the subject does this, you can do this. If the subject does that, then you can do this. And they were able to use that extensively. This was a centerpiece of the defense to let Officer DeWitt walk the jury through the model and say, well, she's an assailant. So if she's an assailant, I have these 12 categories of force I can use. And because I chose to use this particular force, actually what I was doing was de-escalation. And this was a demonstrative exhibit, but it was put on the screen, the big TV screen in the courtrooms. Every juror had their own television screen. And it was put up again in closing argument. This is important because it confuses the jury on the proper legal standard. The reason this exact same model was kept out in Brown is because it's irrelevant as to the department's rubric. Compliance with their own rules does not mean it's constitutional. And the way it was used, the extensive way it was used, confused the jury on the proper legal standard. All right, thank you. If I could use the rest of my time for a moment. Ms. Barney? May it please the court. The district court's judgment should be affirmed. Ms. Bedford challenges a handful of trial errors, and none of them warrant a new trial. The district court's rulings were careful exercises of discretion, and the judgment should be affirmed. I'll start with Dr. Shepard's testimony. His testimony about malingering was properly allowed. The district court reasonably concluded that malingering is a medical term that's within the purview of experts. But you don't contest that there was no diagnosis of malingering, there was no evaluation for malingering by any medical professional. So there was no medical professional that diagnosed Ms. Bedford specifically with malingering, but the way that Dr. Shepard described, I'm just going to abbreviate the mental health condition, the way he described PNES is that that itself can be malingering. One thing that he said at trial is that it can be voluntary, and anyone could fall to the floor right now and have a pseudo-seizure for a variety of reasons. So respectfully it's not really correct to say that the experts agreed 100%. They agreed on the label of the diagnosis, but they didn't agree on how it's manifested. And the way that Dr. Shepard described it is PNES itself can be a form of malingering. Malingering actually doesn't appear in his paper. I actually have it here. If you take my word for it, it doesn't. What he says is, I would strongly disagree with Dr. Tappan's suggestion that this is always not in the control of the patient. A functional neurological disorder can occur consciously or it could occur subconsciously. That is when he's introducing this concept. You know, the judge kept out the mention of secondary gain, right? And I'm not sure what happened at trial, because we do have the examples of secondary gain that she allows in at trial. What do you say to that? Those examples, so the secondary gain comment was struck. The examples that he gave of malingering were fleshing out the general definition that he gave. These were not tied to Ms. Bedford, and importantly, it was left to the jury to decide whether in fact Ms. Bedford was... It seemed to be indirectly going around the judge's order in Lemonet, right? She was uncomfortable with mentioning the concept of secondary gain and the slip and fall, the workman's comp malingering, the classic cases, right, that the witness was allowed to talk about. And so wasn't that an indirect way of getting to secondary gain, which the judge had found was prejudicial in the pretrial conference? I disagree. Those were examples of what malingering looks like. It's part of the definition. Those things all met the description of what malingering is, but Dr. Shepard did not cross the line of saying Ms. Bedford was malingering or opining on her credibility. And there was a lot of evidence in the record. There was a strong factual link between that general concept of malingering and the other evidence in the case. So what did the jury need to have a neurologist who's not a psychiatrist, and I think he acknowledges a psychiatrist needs to look at her to figure out really what's happening here. Why does the jury need a doctor from Northwestern with, quote, status? That's why she loves the hypo and overrules. Why does the jury need to hear that she might be lying from a neurologist? So he was the only neurologist that testified. There was a lot of testimony and terminology thrown around at trial about whether this was a seizure. But I think everyone agreed that it was not a non-epileptic seizure, correct? This doctor was in to say that she was faking it, correct? He was there to describe, he had a different description of what PNES is than Dr. Tavon. And the different description was it can be conscious, it could be pretend. Someone could pretend to have a seizure, right? That's correct. Yes, and that is, he is qualified to give that opinion. Even though he's not a psychiatrist? Well, he also described it as a functional neurological disorder, so there was a neurological component to it. And it's something that he'd encountered. He had the expertise to testify about it. And there was, she also had, Ms. Bedford also described other, a constellation of symptoms like leg weakness, stuttering. She testified that she blacked out. These are all things that no other medical professional diagnosed her with or mentioned that was happening. She described a more extreme form of what she went through than any medical professional. And it was helpful to have a neurologist there at a trial when the word seizure was being thrown around. This was a lot of witnesses. Many of them used the term with some description of what Ms. Bedford was doing. I thought the judge barred any lay witness from calling it a seizure. She said, describe what physically is happening, but not calling it a seizure. And even Ms. Bedford's own treating physician said this was not an epileptic seizure, correct? That is correct. But I think what was permitted and what the testimony was that came out was the witness could say, I saw X, Y, and Z. Ms. Bedford appeared to have a seizure. And that happened several times during the trial. So it was helpful to have a neurologist up there saying, okay, let me describe for you what this, what everyone's talking about here. And in a way that was different from what Dr. Taplan said, the two experts disagreed. And this, it was helpful to hear that perspective. It was based on his expertise and there was a strong factual link between what Dr. Shepard was testifying about and the other evidence that was presented. There was no error here. And let me talk about the term malingering, because I don't see it in his report. And I think at trial, I believe it's counsel for the defendant that mentions malingering as a term for the first time, right? I looked at the DSM and I know there was a secondary gain component of the malingering diagnosis. Was, is it your opinion that there was malingering or are, the judge clearly wanted secondary gain out of the case. And my problem here is this feels sneaky. This feels like getting malingering in when the judge said, don't talk about secondary gain, that she's faking it for secondary gain. And then these hypos come in. I mean, I have a problem with that. It feels, especially when there is no diagnosis of malingering in the expert report at all. Even if the expert report doesn't use the term malingering, the concept is there. And it's, these are general. But did it get confused though? Because you could talk about malingering in the lay sense and you could talk about malingering as a diagnosis and he's a doctor without a diagnosis opining on malingering, which carries weight for a jury. Does it not? And should that have come in without an actual diagnosis? There wasn't a need for, he didn't diagnose Ms. Bedford with malingering. He said, so to be clear, the way Dr. Shepard conceives, the way he describes PNES is consistent with malingering, that it's a form of malingering. So his description of what she experienced means she could be faking, she could be exaggerating, but he didn't say specifically that's what she was doing. This was one possibility. This was one inference. What was the other evidence from lay witnesses that she was faking it? That existed, did it not? It did, yes. So there were witnesses who testified that she had leg weakness, that she was stuttering, that there was a video shown of her walking and laughing. She, again, she testified that she blacked out. No other medical professional said that happened, that would happen with what, with PNES. And no medical professional said that she had any problems with her speech or any problems with her walk. That was, that is a strong- Any problems with, I'm sorry, I couldn't hear that. Her walk or her speech. Thank you. And this was one inference raised by Dr. Shepard's testimony. The counsel was entitled to argue one way or the other. The jury could draw its own conclusion. The jury was not told specifically that Ms. Bedford is malingering. Dr. Shepard put a few inferences out there and it was up to the jury to decide what the evidence supported and that's exactly what it did. I'll turn to Nurse Soas' testimony, which was also properly admitted. The testimony about Ms. Bedford's conduct at the hospital was an integral part of Ms. Bedford's claim for damages and her claim that Officer DeWitt used an unreasonable amount of force. It was not propensity evidence. The hospital is the setting for much of the evidence relating to damages. It was there that Ms. Bedford was treated for the seizure-like activity that occurred on the sidewalk. Say we agree with that general category of testimony. What's the independent admissibility and what's the relevance with everything else coming in already for the racially charged comment? So first of all, the racially charged comment was forfeited. The final, the district court judge's final ruling was that she would consider each objection as it came up and... But wasn't there an objection made at the very beginning of Nurse Soas' testimony? That's correct. And the judge was pretty clear at that point. I heard a 404B objection and the judge overruled it very definitively. So I think under our precedent, to object for every single question that follows is not necessary when the judge has clearly shut the door, right? Okay. Yes, I accept that. So the racial comment has to be considered in context. It was not just an isolated incident. This was part of the whole system. Well, actually, I'm interested in this timing issue that counsel brought up because I had been persuaded that all this behavior was relevant to Dr. Tappan's diagnosis, but I think he's making the point that this interaction and this threat to kill the nurse happened at discharge, so therefore could not actually have been a basis of Dr. Tappan's diagnosis. Is that how you understand the argument and what do you say in response? Sure. So what I would say in response is that even if that happened after she had seen Dr. Tappan, it happened in the context of, so here's what happened. She was, again, displaying the seizure-like activity, and at that point, the nurse started to discuss various interventions that could be taken for that, and then Ms. Bedford stopped and then threatened the nurse right after that, and that's when that racial comment came out. So this was all part of one course of conduct, one interaction of how she's responding to the people who are trying to help her right after she's displayed the same activity that she says is her injury. So it has to be considered as a whole. This is a whole course of conduct. It wasn't one isolated thing. And so it's part and parcel of her damages. It's also part and parcel of how injured she is, that when the people are trying, when people at the hospital are trying to help her, this is how she's reacting. She wants to leave. She's threatening medical professionals, and she's resisting treatment, and it supports an inference that this activity is something that she can turn on and off. So that's all relevant to her damages, and the extent to which she was injured is also a circumstance that, as the jury was instructed, could be considered in deciding whether the force was reasonable. So this was not propensity evidence. It was part and parcel of her damages claim and to the question of whether the force used was reasonable. As for the use of force model, that was also, the references to the model were also allowed properly in the district court's discretion. The model was used entirely consistently with the guidance issued by the court. This court, Officer DeWitt used the terms of the model to explain what he observed, how he acted in response. This interaction between Officer DeWitt and Ms. Bedford lasted mere seconds, and the model helped the jury understand what happened in that short time. The references to the model were also relevant to Ms. Bedford's request for punitive damages, which involved assessing Officer DeWitt's state of mind, and under this court's precedence, it's clear that evidence of police training may be used for these purposes. There were also guardrails to ensure that the model was not used improperly. The jury received a limiting instruction about how to apply the model, was told that the model didn't decide whether the force used was excessive, and the model was only a demonstrative exhibit, and the jury was instructed that a demonstrative exhibit is not itself evidence or proof of any facts. I will rest on our brief for our arguments relating to the audio that was properly excluded and the prior encounters involving Officer DeWitt. All of the evidentiary issues were reasonable and proper exercise of the district court's discretion, and if there are no further questions, we ask that the judgment be affirmed. Thank you, Counsel. We'll round up to a minute and a half. If first of all, and this is important, there was absolutely no testimony from Dr. Shepard that psychogenic non-epileptic seizures were a form of malingering. That was not anywhere in the record. What happened is he described what are the same type of seizures that the treating psychiatrist already told the jury about, and then he just went into a quick pivot about malingering. Tell us about malingering. So there was no connection of malingering to the actual mental health diagnosis. Since there was no opinion, no mythology, no conclusion, no opinion that Ms. Bedford was malingering, all this testimony was simply irrelevant, and it was overly prejudicial because once again, you have character assassination through an expert with medical terms, an indirect comment on her credibility. This was not tied to Ms. Bedford in any way, the malingering. And Your Honor is correct about the secondary gain. When that was objection sustained, there was an automatic pivot to, well, what if somebody slips in front of a target? What about workers' compensation? And when we objected, the final question on that was, can somebody malinger to avoid arrest? And Dr. Shepard says it's possible. Now, how is that helpful to the jury? Because all that does is throw out the inference that she's some big scam artist without any specific analysis, diagnosis, or conclusion that that's what in fact happened here. This was absolutely an end-around Rule 702, which I submit this court should not permit. It was not helpful in any way to the jury. And although Dr. Shepard did disagree with Dr. Tapan about the voluntariness of the movement, he did make that comment, well, anybody in the jury could just go down and start flopping around. But that's not helpful because we had video of what happened to Ms. Bedford. And if you looked at that video, he had no opinion that that's what Ms. Bedford did. And he had the videos, and he looked at it, he had all the medical records, and more importantly, he had the history of this. Both grandmothers testified, and there were medical records going back through high that this, in fact, was a condition that she suffered from. Your Honor, thank you very much, and we ask that you send this case, remand this case back for a new trial. Thank you, counsel. Apologies for mispronouncing your last name. We'll take the case under advisement.